[Cite as *State v. Washington*, 2014-Ohio-4178.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | APPEAL NO. C-130213 |
| | | TRIAL NO. B-1107595B |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| BRENDAN WASHINGTON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 24, 2014

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Rachel Lipman Curran*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela M. Stagnaro*, for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

**CUNNINGHAM, Presiding Judge.**

{¶1}    Defendant-appellant Brendan Washington appeals from the judgment of the Hamilton County Common Pleas Court convicting him, after a no-contest plea, of two aggravated murders and other related offenses.  Washington and three others killed Rudell Englemon and then killed Carrielle Conn, one of their group, to ensure her silence.  Washington was 15 years old when he committed these offenses.  Raising three assignments of error, Washington contends that the juvenile court erred in transferring jurisdiction to the common pleas court, that statements he made to police detectives should have been suppressed, and that his trial counsel was ineffective.  We disagree, and affirm the judgment below.

## *The Englemon Killing*

{¶2}    On October 14, 2011, Washington and the 17-year-old Conn, accompanied by minors Dequantez Nixson and Tyshawn Barker,[1] went to a Cincinnati apartment intending to shoot its occupant, Samuel Jeffries.   Jeffries had sworn out a complaint against Nixson's mother, Lakeshia Prince, for felonious assault and domestic violence.   At Nixson's urging, the group planned to shoot Jeffries in retaliation.  Nixson and Barker waited in the hallway while Washington knocked on the door to summon Jeffries.  But instead of Jeffries, Englemon answered the door.  Conn shot Englemon.  As the group fled, Nixson told them that they had shot the wrong man.  Englemon survived for one week.

## *A Second Killing to Silence Conn*

{¶3}    Nixson learned that Conn had told Jeffries of their involvement in killing Englemon.  Concerned that Conn would "snitch" to the police, on October 16, 2011, Nixson called Conn to lure her to a deserted train track near Victory Parkway in Cincinnati.  Nixson told police that Washington then shot Conn with his .22-caliber

---

[1] We affirmed Barker's convictions in *State v. Barker*, 1st Dist. Hamilton No. C-130214, 2014-Ohio-3245.

revolver and passed the gun around to the group to fire additional shots into Conn's body. Washington claimed that Nixson had fired the first shot and that when the gun was passed to him, Washington tried to shoot the fallen Conn but the revolver failed to fire. Nixson was later found with Conn's red and black cellular telephone in his possession.

{¶4} Nixson's mother, who was at the apartment where Englemon was shot, identified Conn as one of the individuals involved in the first shooting. Nixson was brought in for questioning and admitted his involvement. He also confirmed Barker's and Washington's participation in the shootings.

### The Transfer and Trial Court Proceedings

{¶5} The surviving perpetrators were soon apprehended. Washington was found in a derelict Avondale apartment building. During a two-hour interrogation by Cincinnati police detectives Kurt Ballman and Terry McGuffey, Washington admitted his role in the killings. His confession was recorded electronically and preserved by a DVD recording. The police filed a delinquency complaint including charges of murder against Washington in juvenile court on October 24, 2011.

{¶6} The juvenile court conducted a discretionary-transfer proceeding and found that there was probable cause to believe Washington had committed the charged crimes. An evaluation assessing Washington's amenability to rehabilitation in the juvenile system was prepared by clinical psychologist Dr. Kathleen Hart. The court heard the arguments of counsel and reviewed the evaluation and the evidence before it. On November 30, 2011, the juvenile court ordered that Washington be transferred to the jurisdiction of the common pleas court.

{¶7} The grand jury returned a multiple-count indictment against Washington, Barker, and Nixson. Washington moved to suppress his statements to the police. Following the common pleas court's denial of the motion, Washington entered pleas of no contest to all the charges. The trial court accepted his pleas and found him guilty of the aggravated murder and aggravated robbery of Englemon and

Conn, the accompanying specifications, and multiple counts of tampering with evidence. It imposed an aggregate sentence of 25 years' to life imprisonment.

### *The Juvenile Court Properly Transferred Jurisdiction*

{¶8}    In his first assignment of error, Washington argues that the juvenile court erred in transferring jurisdiction over his case to the common pleas court. He challenges both the juvenile court's determination that probable cause existed to believe that Washington had committed the charged acts, and its determination that Washington was not amenable to care or rehabilitation within the juvenile system.

{¶9}    **Discretionary Transfer**.    Juvenile courts possess "exclusive jurisdiction" over delinquent children who commit acts that would constitute crimes if committed by an adult. *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 11, citing R.C. 2151.23(A)(1). But more than 40 years ago, this court recognized that the juvenile court system may not be able

> to protect the public in those cases where rehabilitation appears unlikely and circumstances indicate that if the charge is ultimately established society would be better served by the criminal process by reason of the greater security which may be achieved or the deterring effect which that process is thought to accomplish.

*In re Mack*, 22 Ohio App.2d 201, 203, 260 N.E.2d 619 (1st Dist.1970).

{¶10}    R.C. 2151.12 permits juvenile courts to transfer certain juveniles to adult court to face criminal sanctions. There are two types of transfers under Ohio's juvenile scheme: mandatory and discretionary. *See State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894, ¶ 10. A juvenile court has discretion to transfer, or bind over, to an adult court, juvenile offenders who have committed felony-level offenses, who are at least 14 years of age, who do not appear to be amenable to care or rehabilitation within the juvenile system, and who appear to be a threat to public safety. *See D.W.* at ¶ 10; *see also* R.C. 2152.10(B) and 2152.12(B); Juv.R. 30(C).

4

{¶11}   A juvenile court's order granting transfer is not immediately appealable. As here, any errors alleged in the transfer proceeding must be raised in an appeal from the subsequent judgment of the adult court.  *See In re Becker*, 39 Ohio St.2d 84, 314 N.E.2d 158 (1974); *see also State v. Wilson*, 73 Ohio St.3d 40, 44, 652 N.E.2d 196 (1995).

{¶12}   **The Probable-Cause Determination.**   A discretionary-transfer proceeding has two components: a probable-cause determination and an amenability determination.  *See In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 38; *see also State v. Whitterson*, 1st Dist. Hamilton No. C-110207, 2012-Ohio-2940, ¶ 19. When, as here, the state has sought discretionary transfer, the juvenile court must first determine if the juvenile offender is at least 14 years of age and whether probable cause exists to believe that the juvenile committed the acts charged.  *See* R.C. 2152.12(B)(1) and (2).

{¶13}   To establish probable cause, the state must provide credible evidence of every element of the charged offense.  The state must produce evidence that raises more than a mere suspicion of guilt, but it need not provide evidence proving guilt beyond a reasonable doubt.  *See A.J.S.* at ¶ 42 and 46; *see also In re Moore*, 1st Dist. Hamilton Nos. C-090576, C-090577 and C-090578, 2010-Ohio-3991, ¶ 22; *In re D.S.,* 1st Dist. Hamilton No. C-130094, 2013-Ohio-4565, ¶ 6.   Because a juvenile court's probable-cause determination involves questions of both fact and law, an appellate court defers to the juvenile court's determinations regarding witness credibility, but reviews de novo its legal conclusion as to whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged.  *See A.J.S.* at ¶ 51.

{¶14}   Here, to establish probable cause for the aggravated murders charged in this case, the state had the burden to provide credible evidence that Washington had purposely, and with prior calculation and design, engaged in conduct that caused the deaths of Englemon and Conn.  *See* R.C. 2903.01(A).  Because the other charged offenses were committed during the same course of conduct, the juvenile court had the authority to

transfer the entire case pursuant to R.C. 2152.12(I) once it found sufficient probable cause to warrant transfer of the aggravated-murder charges to the adult court, and found that Washington was amenable to transfer.

{¶15} Washington challenges the juvenile court's determination that the state had demonstrated probable cause. He contends that there was no physical evidence, nor were there independent witnesses, linking Washington to the crimes, and that the state had relied too heavily upon the testimony of his codefendants.

{¶16} But the state adduced ample, credible evidence on each element of the offenses, including Washington's own statements to police detectives, demonstrating that Washington, standing next to Conn, had knocked on the door to gain access to Jeffries' apartment when Conn shot Englemon. He admitted that the group had planned to shoot Jeffries as payback for signing a criminal complaint against Nixson's mother. Washington admitted that he was with Nixson and Barker when they lured Conn onto the train tracks. He admitted that the group had used his .22-caliber revolver to shoot Conn. Finally, he admitted that he had tried to shoot her. The state met its burden to establish probable cause.

{¶17} **The Amenability Determination.** If, as here, the juvenile court determines that probable cause exists, it must continue the proceeding for an investigation, including a mental examination of the juvenile offender. *See* R.C. 2152.12(C); Juv.R. 30(C). The court must then hold a hearing to determine whether the child is amenable to care or rehabilitation within the juvenile system and whether the safety of the community may require that the child be subject to adult sanctions. *See* R.C. 2152.12(B)(3).

{¶18} In reaching its amenability determination, the juvenile court is required to consider certain statutory factors and decide whether the factors in favor of transfer outweigh the factors indicating that the case should remain in juvenile court. *See* R.C. 2152.12(B)(3). R.C. 2152.12(D) lists the factors in favor of transferring jurisdiction, while

R.C. 2152.12(E) lists the factors in favor of retaining jurisdiction. In addition to the enumerated factors listed in those statutes, the juvenile court is instructed to consider "any other relevant factors." R.C. 2152.12(D) and (E). The juvenile court must ensure that the record of its determination "indicate[s] the specific factors that were applicable and that the court weighed." R.C. 2152.12(B)(3).

{¶19} Unlike the probable-cause determination, "an amenability hearing is a broad assessment of individual circumstances and is inherently individualized and fact-based." *M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, at ¶ 14. Therefore, a reviewing court will not reverse the juvenile court's amenability determination unless the court has abused its discretion. *See id.*, citing *A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 39 and 40; *see also Barker*, 1st Dist. Hamilton No. C-130214, 2014-Ohio-3245, at ¶ 7 and 8 (using the abuse-of-discretion standard of review where the juvenile-appellant challenges only the court's amenability determination).

{¶20} Here, Washington claims the amenability determination was flawed because the juvenile court "only considered" four of the 19 statutory factors—each of the four supporting transfer. He argues that the court failed to consider factors against transfer. *See, e.g.,* R.C. 2152.12(E)(3), (5), and (6). The juvenile justice system, he argues, would provide "the last hope" for his rehabilitation, and the juvenile court's focus on the severity of the crimes skewed its weighing of the factors.

{¶21} Following the amenability hearing, the juvenile court determined that Washington was not amenable to rehabilitation within the juvenile justice system and that a transfer to the common pleas court was appropriate. The court stated that it had reviewed the detailed, six-page evaluation of Washington prepared by Dr. Hart, and all other evidence before it.

{¶22} The juvenile court found that the complaint alleged Washington had committed acts that would be punishable as felonies if committed by an adult, and that Washington was 15 years old at the time of the acts charged. *See* R.C. 2152.12(B)(1) and

(2). It next considered the statutory factors in favor of and against transfer. *See* 2152.12(B)(3). It found four factors in favor of transfer: that Washington had used a firearm in both murders, that the second murder was carried out to silence "a witness to the first homicide," that Washington was emotionally, physically, and psychologically mature enough for transfer, and that there was not sufficient time to rehabilitate him within the juvenile system. *See* R.C. 2152.12(B)(3) and 2152.(D)(5), (8), and (9). The court found no applicable factors against transfer and concluded that the applicable factors in favor of transfer outweighed any factors against. Therefore, the court found that there were reasonable grounds to believe that Washington was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required adult sanctions. *See* R.C. 2152.12(B)(3).

{¶23}  Contrary to Washington's assertion, the juvenile court's entry indicates that it considered each of the statutory factors. In accordance with R.C. 2152.12(B)(3), the court identified only "the specific factors that were applicable and that the court weighed," both in its entry and in its pronouncement at the amenability hearing. Where there is no statutory requirement that the juvenile court separately identify factors that are not applicable, it does not err if it fails to do so, as long as it has indicated, in the record, the factors that it weighed in favor of or against transfer.

{¶24}  At the time of the amenability hearing, Washington was 16 years old. Dr. Hart found that he understood the nature and severity of his situation. She found him alert, well oriented, rational and coherent. Her evaluation found no mental- or physical-health issues that would preclude transfer to the adult system. The juvenile court doubted whether Washington's "relatively short time frame" remaining in the juvenile system was sufficient for rehabilitation commensurate with his participation in a double homicide, the second of which was done to prevent a witness from testifying against him.

{¶25}  Washington had had numerous prior contacts with the juvenile justice system. He had been adjudicated delinquent ten times in the previous two years for

offenses including theft, receiving stolen property, and possession of a counterfeit controlled substance. He had refused to participate in the court's most recent rehabilitation programs. And he had been "on the run," supporting himself and living a transient life in the months previous to the murders.

{¶26} As required by R.C. 2152.12(B)(3), the record indicates "the specific factors that were applicable and that the court weighed," and the reasons for transfer. *See* Juv.R. 30(G). Based on the record, the juvenile court properly complied with all the requirements for discretionary transfer. The juvenile court's amenability determinations are amply supported by the record and evince a sound reasoning process. *See State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, citing *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). The court did not abuse its discretion. The first assignment of error is overruled.

### Washington's Confession Was Voluntary

{¶27} In his second assignment of error, Washington contends that the trial court erred in denying his motion to suppress his statements made to police detectives. Washington argues that, despite signing a waiver-of-rights form, he did not voluntarily and knowingly waive his right to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Washington now argues that his young age and limited experience with the criminal justice system, his lack of sleep, the absence of family members available to him during questioning, and police trickery prevented him from knowingly waiving that right.

{¶28} We review a trial court's ruling on a motion to suppress in a two-step process. First, we must accept the trial court's findings of historical fact if they are supported by competent, credible evidence. *See State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Then this court must make an independent

determination, as a matter of law, without deference to the trial court's legal conclusions, whether those facts meet the applicable constitutional standards. *See id.*

{¶29} The state bears the burden of demonstrating by a preponderance of the evidence that Washington's waiver of rights and statement were voluntary. *See State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 32; *see also State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶ 17 (1st Dist.). The state sought to discharge that burden by relying on a recently enacted statute, R.C. 2933.81, effective July 6, 2010. To encourage the police to record the custodial interrogation of suspects accused of homicide or serious sex offenses, the General Assembly has provided that when the police make "an audio and visual recording that is an authentic, accurate, unaltered record" of the interrogation, the suspect's statements made during the interrogation are "presumed to be voluntary." R.C. 2933.81(A)(3) and (B). Pursuant to the statute, the suspect then has "the burden of proving that [his] statements * * * were not voluntary." R.C. 2933.81(B).

{¶30} Here, police detectives made a DVD recording of their custodial interrogation of Washington, who was then a suspect in the investigation of two aggravated murders. Detective Ballman testified at the motion-to-suppress hearing that the DVD recording was a fair and accurate record of the interrogation. The DVD disc and transcript were admitted into evidence. The state also offered Washington's waiver-of-rights form into evidence. Detective Ballman testified that after he had explained each of his rights to him, Washington signed the waiver-of-rights form and agreed to answer questions. We note that Washington first signed the waiver form as Jeremy Neely, a false name that he had originally given to the detectives. He subsequently signed the form as Brendan Washington. Detective Ballman then briefly testified that that he had no reason to believe that Washington had not voluntarily waived his rights. The state rested.

{¶31} Washington's trial counsel then extensively cross-examined Detective Ballman, attempting to highlight factors indicating that Washington had not voluntarily

waived his rights. Whether a juvenile has voluntarily, knowingly, and intelligently waived his *Miranda* rights and answered police questioning may be inferred from the totality of the circumstances surrounding the waiver, including the age, mentality, and prior criminal experience of the accused, the length, intensity, and frequency of interrogation, and the existence of physical deprivation or inducement. *See In re Watson*, 47 Ohio St.3d 86, 548 N.E.2d 210 (1989), paragraph one of the syllabus; *see also Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 32. We note that Washington did not challenge the constitutionality of R.C. 2933.81 in the trial court, and he has not raised the issue here.

{¶32}    On cross-examination, Detective Ballman testified that he and Detective McGuffey had questioned Washington from 4:48 a.m. until just before 7:00 a.m. on October 20, 2011. While Washington was sleeping on chairs in the interview room when the detectives arrived, Washington remained fully awake during the ensuing questioning. Washington acknowledged that he could read and write, and that he was not under the influence of alcohol or drugs, before signing the waiver-of-rights form. He was given a snack to eat and was offered drink and the opportunity to use a bathroom during the questioning.

{¶33}    There was ample competent, credible evidence adduced at the hearing to support the trial court's conclusion, announced orally on June 13, 2012, that Washington had been properly advised of his rights prior to making his statements and that he had knowingly waived those rights. A signed waiver form is "strong proof" of the validity of the waiver. *State v. Moore*, 81 Ohio St.3d 22, 32, 689 N.E.2d 1 (1998). Washington never asked to speak to an attorney or to family members before or during questioning. While Washington was only 15 years old, his age, by itself, does not render his waiver involuntary. *See Watson*, 47 Ohio St.3d at 89, 548 N.E.2d 210 (holding a 14-year-old aggravated-murder suspect's statements to be voluntary); *see also State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716 (holding a 15-year-old aggravated-murder

11

suspect's statements to police to be voluntary). And Washington was not a neophyte in dealings with law enforcement and the juvenile court.

{¶34} Finally, there is no evidence of police coercion or overreaching during the interrogation. Washington did not appear to be cowed by the police questioning. He engaged the detectives and responded to their questions in a logical manner. The detectives' statements that if he did not tell the truth, they could not help him were more akin to an admonition to tell the truth than a promise of possible benefits and were not improper. *See, e.g., State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042.

{¶35} Under the totality of the circumstances surrounding the questioning, it is clear that Washington did not rebut the presumption, established by the DVD recording, that he had been properly advised of his *Miranda* rights and that he understood those rights when he signed the waiver form and answered the detectives' questions. Based upon the evidence presented, we hold that the trial court was justified in denying Washington's motion. The second assignment of error is overruled.

## Trial Counsel Was Not Ineffective

{¶36} Finally, Washington argues that he was denied the effective assistance of counsel when his trial counsel failed to challenge Dr. Hart's evaluation at the amenability hearing, failed to obtain his own psychological expert, and failed to call family members or friends to testify about Washington's lack of maturity.

{¶37} To prevail on his claim of ineffective assistance of trial counsel, Washington must first show that trial counsel's performance was deficient, and second, that the deficient performance was so prejudicial that he was denied a reliable and fundamentally fair proceeding. *See Strickland v. Washington* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Lockhart v. Fretwell*, 506 U.S. 364, 369-370, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

**{¶38}** Here, Washington's experienced trial counsel cogently argued to the juvenile court that the mental-health evaluation supported a number of factors arguing against transfer to the adult court, including that Washington had cooperated with the police, that he had not been the principal actor in either murder, that he had been under the sway and influence of Nixson, and that Washington's prior delinquency adjudications had been for relatively minor offenses and had not required rehabilitation at a residential facility. He also argued that there was ample time to rehabilitate the then 16-year-old Washington in the juvenile system, and that the Department of Youth Services could provide reasonable assurances of public safety.

**{¶39}** The record is silent as to whether other evidence favorable to Washington existed. Washington had been homeless for several months before the murders. He had had a troubled relationship with his mother and had not seen his father in three years. A trial counsel's decision whether to call witnesses falls within the rubric of trial strategy and will not be second-guessed by a reviewing court. *See State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001), citing *State v. Williams*, 74 Ohio App.3d 686, 695, 600 N.E.2d 298 (8th Dist.1991). Moreover, Washington's family and emotional difficulties were fully detailed in Dr. Hart's evaluation. *See State v. Whitterson*, 1st Dist. Hamilton No. C-110207, 2012-Ohio-2940, ¶ 27-28. Washington has thus failed to establish that counsel's performance was deficient or that any alleged deficiency deprived him of a fair hearing. The third assignment of error is overruled.

**{¶40}** Therefore, the judgment of the trial court is affirmed.

Judgment affirmed.

**FISCHER** and **DEWINE, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.