[Cite as *State v. Howard*, 2019-Ohio-5113.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                               :

    Plaintiff-Appellee,          :

                                     Nos. 107467, 107468
                                       and 107469

    v.                                       :

KRILLIAN HOWARD,                             :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 12, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-17-618513-A, CR-17-622059-A and CR-17-623374-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Frank Romeo Zeleznikar, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Krillian Howard appeals his bindover from the Juvenile Division of the Cuyahoga County Court of Common Pleas and the sentence imposed in the General Division. He asserts two assignments of error:

1. The juvenile division of common pleas court improperly relinquished jurisdiction over the charges against the juvenile appellant where probable cause was not established and therefore the general division of common pleas court lacked jurisdiction over the juvenile appellant.

2. Appellant's sentence is contrary to law because the record does not support the imposition of maximum sentences.

{¶ 2} Howard was indicted in three criminal cases[1] with a total of eight counts of aggravated robbery, seven counts of kidnapping, two counts of felonious assault, two counts of robbery, two counts of having weapons while under disability, one count of attempted murder, one count of theft and one count of obstructing official business. Although Howard was 18 at sentencing, he was actually 16 at the time of the commission of the offenses charged, thus his three cases originated in the Cuyahoga County Court of Common Pleas, Juvenile Division, where they began as four delinquency complaints.[2] In each of the four cases, the juvenile court found probable cause to believe that Howard committed the acts charged and it transferred each from the juvenile division to the general division. Howard pleaded guilty to crimes in all cases.

{¶ 3} Howard was sentenced to 20 years as an aggregate term for the three criminal cases, the high end of the agreed sentencing range of 18-20 years.

---

[1] Cuyahoga C.P. No. CR-17-618513-A, Cuyahoga C.P. No. CR-17-622059-A and Cuyahoga C.P. No. CR-17-623374-A.

[2] Cuyahoga J.C. No. DL-17-105530, Cuyahoga J.C. No. DL-17-105867, Cuyahoga J.C. No. DL-17-112047 and Cuyahoga J.C. No. DL-17-112060.

{¶ 4} In CR-17-618513-A, Howard was sentenced to concurrent terms of 11 years on each of two counts of aggravated robbery with a three-year sentence for the firearm specification to run prior, and consecutive, to the underlying sentence.

{¶ 5} In CR-17-622059-A, Howard was sentenced to serve 11 years on the charge of aggravated robbery with a three-year sentence for the firearm specification to run prior, and consecutive, to the underlying sentence.

{¶ 6} In CR-17-623374-A, Howard was sentenced on two counts of aggravated robbery to concurrent terms of 11 years with a three-year firearm specification to run prior, and consecutive, to the underlying sentence.

## I. Relevant Procedural and Factual Background

{¶ 7} These cases began as four complaints filed in the Cuyahoga County Court of Common Pleas, Juvenile Division. The juvenile court found probable cause to believe that Howard committed the acts charged in all four cases. In two cases, the court determined probable cause via hearing.[3] In the other two cases, Howard stipulated to probable cause and waived his right to a hearing.

{¶ 8} In both cases where the court determined probable cause via hearing, as well as in one case in which Howard stipulated, the court further found Howard was:

> [C]harged with a category two offense and is alleged to have had a firearm on his person or under his control during the commission of the offense, and displayed, brandished, indicated possession of, or used the firearm to facilitate the commission of the offense.

[3] DL-17-105530 and DL-17-105867.

In the fourth case, the court ordered an investigation into whether Howard was amenable to juvenile rehabilitation. After a hearing on that issue, the court determined that he was not.

{¶ 9} The juvenile court relinquished jurisdiction over all four cases and transferred them to the general division. The two cases subject to a probable cause hearing were consolidated into one indictment.

## II. Law and Analysis

## A. Probable Cause Determination

{¶ 10} In Howard's first assignment of error, he argues that the juvenile court erred by transferring his cases to the general division because there was not probable cause to believe that he committed the acts charged.[4] We disagree. For the reasons that follow, we find the state presented evidence by which the juvenile court could conclude there was probable cause to believe that Howard committed the acts charged.

---

[4] Howard does not specify that this assignment of error pertains to DL-17-105530 and DL-17-105867, where the court determined probable cause following a hearing. Nevertheless, we do not construe Howard's challenge as applying to the two cases in which he stipulated to probable cause and waived his right to a hearing. *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 66, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. ("The doctrine of invited error * * * specifies that a litigant may not 'take advantage of an error which he himself invited or induced.'").

**1. Jurisdiction to Transfer**

{¶ 11} In general, R.C. 2151.23(A) provides juvenile courts exclusive jurisdiction over children alleged to have committed acts that would constitute crimes if committed by an adult. *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 11. Nevertheless, a juvenile court has the duty to "transfer a case, or bind a juvenile over, to the adult criminal system" in two instances. *Id.* citing R.C. 2152.10 and 2152.12; *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894, ¶ 10 (discussing "[m]andatory transfer" and "[d]iscretionary transfer"). R.C. 2152.10 and 2152.12 in conjunction with Juv.R. 30 provide the statutory and procedural framework by which a juvenile court relinquishes its jurisdiction over an allegedly delinquent child and transfers the case to the court that would otherwise have had jurisdiction if the offense was committed by an adult. *See In re C.G.*, 8th Dist. Cuyahoga No. 97950, 2012-Ohio-5286, ¶ 30; *see State v. Washington*, 1st Dist. Hamilton No. C-130213, 2014-Ohio-4178, ¶ 10.

{¶ 12} Before transferring a case, the juvenile court is first required to make a determination that there is probable cause to believe that the child committed the act charged. *See M.P.* at ¶ 11. In order to establish probable cause to believe that a juvenile committed an offense "'[t]he state must provide credible evidence of every element of an offense * * * that raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt.'" (Emphasis deleted.) *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 42, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001).

**{¶ 13}** Although the juvenile court is required to evaluate the quality of the state's evidence in support of probable cause in conjunction with any evidence offered on behalf of the juvenile that challenges probable cause, the scope of its analysis, nevertheless, may not exceed this determination. *Id.* at ¶ 43-44; *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, ¶ 10 ("[The juvenile court] is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the fact-finder at trial.").

### 2. Evidence Establishing Probable Cause

**{¶ 14}** Here, the two juvenile cases subject to a probable cause hearing both involved armed robberies.

**{¶ 15}** The first case involved the armed robbery of a man standing at a bank ATM. In it, Howard was charged with two counts of aggravated robbery, one count of felonious assault, one count of kidnapping, one count of having weapons under disability and one count of grand theft. All counts aside from the having weapons while under disability charge had both one- and three-year firearm specifications.

**{¶ 16}** The second case involved the armed robbery of a Subway restaurant. In it, Howard was charged with one count of attempted murder, one count of aggravated robbery, three counts of kidnapping and two counts of felonious assault. All of these offenses aside from the having weapons while under disability charge had both one- and three-year firearm specifications attached.

**{¶ 17}** As discussed below, the evidence established relevant commonality between Howard and both robberies. The state presented evidence that an assailant

in both robberies wore a gray hooded sweatshirt and white tennis shoes. When Howard was arrested, he was wearing a gray hooded sweatshirt and search of his house revealed white tennis shoes. The evidence showed that in both robberies, the assailant in gray conducted the crimes using only his left hand, keeping his right arm tucked into the pocket of his sweatshirt. The state also presented evidence that Howard's right arm was amputated "up to his elbow." The evidence also established that during the ATM robbery, the assailant in gray wore a "distinctive" gold watch. When Howard was arrested, he was wearing a gold watch.

### i. The ATM Robbery

{¶ 18} At the bindover hearing, the state presented eyewitness testimony and surveillance video evidence to establish that, on March 21, 2017, the victim went to his bank to withdraw cash from the walk-up ATM of the Ohio Savings Bank on Warren Road in Cleveland, Ohio. The victim testified that, as he stood at the ATM, he was approached by a "young guy" wearing a gray hooded sweatshirt, brandishing a firearm. He described the young man as being of a medium build "maybe 150, 160 pounds," about 5'9" and African American. The victim explained that he could not get a good look at the assailant's face because the young man had the hood up and tied tightly around his face, obscuring all but his eyes and nose.

{¶ 19} Pointing his gun at the victim, the assailant in gray demanded money. A second assailant in dark clothing approached and was also carrying a gun. The victim described this man as larger, weighing approximately 200 pounds, and African American. His face was not obscured.

{¶ 20} The victim opened his wallet to show that he had a single dollar bill and threw it on the ground, telling them "[y]ou can have that." The assailants then demanded the keys to the victim's truck and threatened to shoot him. They took his keys and ordered the victim to walk away. He complied.

{¶ 21} Moments later, the assailants approached the victim again. Again they threatened to shoot him and demanded his phone and phone password. He complied. They asked for his iCloud password, but the victim could not remember it. One assailant struck the victim in the head multiple times with his gun causing him to bleed. The assailants fled, stealing the victim's truck.

{¶ 22} At the hearing, the victim made an in-court identification of Howard's codefendant as the assailant in dark clothing who did not obscure his face. The victim did not identify Howard as the assailant in gray. When asked about it on cross-examination, he stated "like I said, [the assailant in gray] had a hoodie on. It would be really hard to identify him."

{¶ 23} The state also offered video surveillance from the ATM into evidence. The surveillance footage captured much of the robbery and supported the victim's account. For example, the footage confirmed that the first assailant was wearing a gray hooded sweatshirt and that the hood was up and tied tightly around his face and that he was armed with a pistol.

{¶ 24} Moreover, the footage also confirmed that the assailant in gray was wearing a large gold watch and white tennis shoes. It reflected that his right arm appeared shorter than his left and that he kept it tightly tucked into his sweatshirt

pocket, using only his left hand during the robbery.  For example, the video showed that when the assailant in gray appeared to drop something near the truck, he made no attempt to use his right arm to retrieve the object even though he was already holding the gun in his left hand.  Instead, he used his left hand to pick up the object while holding the gun at the same time.

**ii. The Subway Robbery**

{¶ 25} The state also presented evidence that on March 31, 2017, two armed men entered the Subway restaurant on Memphis Avenue in Cleveland, Ohio during the evening shift and demanded the money in the register and the cash box from the back of the store.  One assailant wore a gray hooded sweatshirt tied tightly around his face as well an additional mask to cover his face.

{¶ 26} At that time, the cashier was taking a customer's order at the counter.  A second employee was in the back prep area of the restaurant.  All three witnesses testified at the hearing, however none of them specifically identified Howard as the assailant in gray.  The customer testified that she could not see either assailant's face due to the masks they wore, but stated that Howard and the assailant in gray were "the same height."

{¶ 27} The customer further testified that "two black gentlemen rushed in using profanity, saying 'everybody put your f****** hands up.'"  She put her hands up and "didn't move at all."

{¶ 28} The customer explained that the assailant in dark clothing "just stood right beside [her]," brandishing a "machine-type of gun."  During her testimony the

customer was questioned about whether the assailant in gray used both his right and left hands during the course of the robbery and stated:

> No. He like used — I don't know. It looked like, I want to say — because when he approached me it was like one hand or something. Like it was just this hand he was moving because he kept doing this saying "hurry up, hurry up, hurry up." And he was moving it, like moving this hand.
>
> * * *
>
> And then he came to me because my phone was lighting up * * * like how you get a notification of a text message or a call * * * and he came over to me * * * and grabbed my phone, my wallet.

{¶ 29} The customer further explained that the assailant in gray took her phone and wallet with his left hand, which was also holding the gun. She described that in order for him to pick up her phone and wallet, he first had to set the gun down and then pick everything up together. The assailant in gray then went to the back of the restaurant.

{¶ 30} The customer testified that she did not remember the shooter's skin tone or eye color, but described him as being "five-six."

{¶ 31} The cashier testified that he immediately opened the cash register and put his hands up. The assailant in gray demanded the moneybox from the back. The cashier testified that both assailants wore masks and both were carrying firearms. He stated that one gunman was carrying a pistol but could not describe the firearm carried by the other because he "never really paid close attention to the other one."

{¶ 32} The second employee, a 17-year-old girl, testified that while she was in the back she observed "a guy in [a] gray sweatshirt walk past." "I thought it was

just another customer coming in, so I was about to go up until I seen what was happening. It was all in the moment." She heard one assailant yelling for the cashier to give him the money.

{¶ 33} The second employee testified "I just remember the door [to the back] opening, making eye contact and then everything else from there is a blur because I just laid on the floor. * * * I was shot in my arm." The bullet grazed the employee's breast before it entered her arm, struck her radial nerve and exited the other side of her arm. She collapsed to the ground.

{¶ 34} When asked to describe the shooter she stated "[i]t was a gray sweatshirt with the hood up wearing a mask. All I seen was brown eyes and he was lighter skin." She clarified that he was African American and further described him: "[h]e wasn't super tall, but also wasn't short. So like maybe like five-six, five-seven."

{¶ 35} Video surveillance footage captured the robbery from multiple angles and confirmed the witnesses' accounts. It showed the assailants enter the restaurant, both brandishing firearms. It showed one assailant wearing a gray hooded sweatshirt with the hood up and tied around his face and that he was also wearing a mask, white tennis shoes and a glove on his left hand. It confirmed that he did not use his right arm during the robbery and, instead, kept it tucked tightly into his sweatshirt pocket. It confirmed that he used his left hand to open a door, carry the cash box and take the customer's phone and wallet, even though he was already using that hand to hold the gun. It showed that he shot the employee while holding the gun in his left hand.

{¶ 36} One of the investigating detectives testified about analysis of the surveillance footage. With respect to the assailant in gray, the detective explained that the footage showed he never used his right hand. "[I]t was literally tucked into a hoodie * * * things were being dropped by this gentlemen and this arm never moved * * * he's doing everything with his left hand, everything * * * [the right] arm never moves. It never comes out of his pocket." He explained that when the assailant went to the back of the restaurant that he did not use his right hand to open the door. He instead tucked the gun under his right arm and used his left hand to open the door. The detective further explained:

> And here's the thing that I think is the most distinctive is this square item in the hoodie pocket. It's not a hand. It's not a hand impression. To me it almost looks like a piece of plastic or a brace or something that's in like the hoodie. And you see the whole arm is completely covered and placed into that. That square part there kind of gets my attention because it does not look like a hand. And normally, if you would put your hand in the hoodie, you would see the impression of a hand. That's not a hand, in my opinion.

{¶ 37} The detective further testified that after analysis of the surveillance footage he determined that the assailant in gray was "a thinner black male, light-skinned, young age" and 5'6" or 5'7".

**3. Howard's Challenge to the Probable Cause Determination**

{¶ 38} Howard challenges the transfer of his cases by attacking the juvenile court's probable cause determinations. He argues that transfer was improper because "the state failed to present sufficient evidence to sustain the court's probable cause determinations in either case." He claims that the evidence against him

consisted of "largely" police officer speculation and that "the mere fact" that video surveillance of both crimes indicated that one of the perpetrators only used one of his arms was not enough to constitute probable cause. Howard emphasizes that none of the victims affirmatively identified him in court.

> A juvenile court's probable-cause determination in a mandatory-bindover proceeding involves questions of both fact and law, and thus, we defer to the trial court's determinations regarding witness credibility, but we review de novo the legal conclusion whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged.[5]

*A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 51.

{¶ 39} Here, as discussed, the state presented substantial evidence implicating Howard as the assailant in gray in both the ATM robbery and the Subway robbery. When Howard was arrested, he was wearing a gray hooded sweatshirt that matched the sweatshirt described by the victims as well as the surveillance footage. He was wearing a distinctive gold watch that resembled the watch worn by the assailant in gray during the ATM robbery. There was evidence that Howard's right arm was amputated near the elbow. Surveillance footage from both robberies as well as witness testimony confirmed that the assailant in gray used only his left hand, keeping his right arm tucked tightly into his pocket. Further, police recovered white tennis shoes from Howard's house that matched the shoes worn by the assailant in gray.

---

[5] Howard does not dispute that both cases involved mandatory bindover. *See* R.C. 2152.10.

**{¶ 40}** Based on the evidence presented, we find there is probable cause to believe that Howard committed the acts charged and that transfer to the general division was, therefore, appropriate.

**{¶ 41}** We overrule this assignment of error.

## B. Maximum Sentences

**{¶ 42}** In Howard's second assignment of error he argues that the sentence imposed by the trial court is contrary to law because the record does not support imposition of maximum sentences. We disagree. For the reasons that follow, Howard's sentence is not reviewable. However, even assuming that it was reviewable, his arguments nevertheless lack merit.

**{¶ 43}** For five counts of aggravated robbery and three, three-year firearm specifications, the trial court sentenced Howard to 20 years in prison.

**{¶ 44}** Review of the record reflects that as a part of the plea bargaining process, Howard and the state agreed to a sentence range between 18 and 20 years and made a joint recommendation of that range to the court. During the change of plea hearing, the follow exchange occurred:

> The Court: Now the government has indicated to this court that as part and parcel of this plea agreement with you, that they've entered into an agreement with your lawyer whereby there's been an agreement that you would serve a sentence of between 18 and 22 years. Do you understand that?
> The State: 20 years, your Honor.
> The Court: 20?
> The State: Yes. 20. I apologize.
> The Court: 18 and 20 years. Do you understand that?
> Howard: Yes, your Honor.
> The Court: Did you have any questions with reference to that?

Howard:      No, your Honor.
The Court:   Do you agree that that would be the stretch of your sentence?
Howard:      Yes, your honor.

{¶ 45} R.C. 2953.08(D)(1) provides:

> A sentence imposed upon a defendant is not subject to review under this section if the sentence is authorized by law, has been recommended jointly by the defendant and the prosecution in the case, and is imposed by a sentencing judge.

{¶ 46} Howard concedes that he agreed to a possible range between 18 and 20 years but argues that this court should not construe his agreement to that range as constituting an agreement to a specific 20-year sentence. In essence, Howard argues that review is not precluded because the sentence was not "recommended jointly." Howard makes no claim that the sentence was not authorized by law or that it was not imposed by a sentencing judge. *See* R.C. 2953.08(D)(1).

{¶ 47} We have previously rejected arguments that attempt to distinguish between an agreement to a range of possible sentences and an agreement to a specific sentence for purposes of R.C. 2953.08(D)(1) analysis. *See, e.g., State v. Grant*, 2018-Ohio-1759, 111 N.E.3d 791, ¶ 18 (8th Dist.) ("[T]hey are both negotiated agreements based on a quid pro quo arrangement where each side gives up something in exchange for being bound by the terms of the agreement."). This rationale holds, even where, as is the case here, the trial court sentences a defendant to the maximum sentence in the agreed range. *See, e.g., State v. Rodriquez*, 8th Dist. Cuyahoga No. 107720, 2019-Ohio-3278, ¶ 3, 25. "Where a defendant agrees to a sentencing range, he implicitly agrees to all definite sentencing possibilities within

that range * * *." *Grant* at ¶ 31, citing *State v. Ramsey*, 5th Dist. Licking No. 16-CA-91, 2017-Ohio-4398, ¶ 15. Accordingly, pursuant to R.C. 2953.08(D)(1), Howard's sentence is not reviewable.

{¶ 48} Even were we to assume that R.C. 2953.08(D)(1) did not bar our review of Howard's sentence, his challenge would still fail on its merits.

{¶ 49} R.C. 2953.08(G)(2) guides our review of a felony sentence. As such, where a trial court imposes a sentence "solely after consideration of the factors in R.C. 2929.11 and 2929.12," an appellate court may disturb a sentence "that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 23.

{¶ 50} Although a trial court must comply with R.C. 2929.11 and 2929.12 when it imposes sentence on a particular felony, it is under no obligation to use particular language or to make specific finding on the record to demonstrate this compliance. *State v. Gaines*, 8th Dist. Cuyahoga No. 103476, 2016-Ohio-4863, ¶ 11. Where a trial court does not reference its consideration of R.C. 2929.11 and 2929.12 at the sentencing hearing or in its sentencing journal entry, this court has held that such compliance can be presumed unless the defendant shows otherwise. *See, e.g., State v. Jones*, 8th Dist. Cuyahoga No. 99759, 2014-Ohio-29, ¶ 13.

{¶ 51} Here, the court's sentencing journal entry confirmed that it "considered all required factors of the law," and found that "prison is consistent with the purpose of R.C. 2929.11."

{¶ 52} Beyond these statements, review of the sentencing transcript reveals that the court extensively considered the sentencing factors. For example, aside from recounting details of the ATM and Subway robberies and the injuries suffered by the victims in those cases, there was also discussion about the other crimes for which Howard was being sentenced: the armed robbery of a "younger gentleman" as well as the carjacking of a woman while she was parked in the driveway visiting her 91-year-old mother. In the carjacking case, Howard and others blocked the woman in the driveway, proceeded to rob her at gunpoint and stole her car. There was also discussion of the psychological trauma the victims in these cases suffered.

{¶ 53} Beyond Howard's present cases, the court also recounted "a number of prior violent offenses" that Howard committed. And although the court did recognize that Howard was a juvenile when he committed these offenses, it found his criminal history nonetheless "extensive." The court detailed "several" instances of receiving stolen property, escape, causing harm to government property, fleeing a police officer, attempting to cause physical harm to a police officer, burglary and grand theft of a motor vehicle.

{¶ 54} Additionally, the court noted that it found it particularly disturbing that Howard selectively chose his victims based on their race. The court was made aware of the underlying circumstances surrounding Howard losing his right arm, namely that it occurred after he crashed a stolen car into a train while attempting to flee pursuing police officers.

{¶ 55} Howard makes multiple challenges to the court's consideration of R.C. 2929.11 and 2929.12.  For example, he alleges that his sentence was in excess of what is required to protect the public and punish him and he complains that the court failed to "adequately" account for his relative youth as well as "other relevant mitigating factors."

{¶ 56} We reject these challenges.  This court will not substitute its judgment for that of the trial court.  *State v. Franklin*, 8th Dist. Cuyahoga No. 107482, 2019-Ohio-3760, ¶ 36.  Moreover, we are not empowered to re-weigh sentencing factors.  *State v. Taylor*, 8th Dist. Cuyahoga No. 107881, 2019-Ohio-3367, ¶ 17.

{¶ 57} Howard also complains that the 11-year sentence related to the ATM robbery is "disproportionate" to his codefendant's sentence for the same count.  Howard bases this claim on the unsupported assertion that his codefendant received a five-year sentence despite being the person who hit the victim with the gun.[6]

{¶ 58} Putting aside the dearth of support in the record, we reject the basis by which Howard claims his sentence is "disproportionate."  Proportionality "involves the relationship between the sentence and the defendant's conduct, i.e., is it 'commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim,' or, in other words, 'does the punishment fit the crime.'"  *State v. Ware*, 8th Dist. Cuyahoga No. 106176, 2018-Ohio-2294, ¶ 13, quoting *State v. Moore*, 2014-Ohio-5135, 24 N.E.3d 1197, ¶ 17.  Attacking the

---

[6] We note that the record is devoid of any indication about the nature of the crimes with which the codefendant was charged, whether he was convicted or whether any penalties were imposed.

proportionality of a sentence by comparison to the unsupported claim that a more culpable codefendant's received a lesser sentence necessarily fails.

{¶ 59} Consistency, on the other hand, relates to "the defendant's sentence 'in the context of sentences given to other defendants,' i.e., did the defendant receive a sentence similar to those 'imposed for similar crimes committed by similar offenders.'" *Id.*, quoting *Moore* at ¶ 17. We note that the record here is devoid of any consistency challenge.

{¶ 60} "As courts have long concluded, a 'defendant must raise the consistency-in-sentencing issue before the trial court and present some evidence, however minimal, in order to provide a starting point for analysis and to preserve the issue for appeal.'" (Emphasis deleted.) *State v. Montanez-Roldon*, 8th Dist. Cuyahoga No. 103509, 2016-Ohio-3062, ¶ 14, quoting *State v. Spock*, 8th Dist. Cuyahoga No. 99950, 2014-Ohio-606, ¶ 37. There is no indication that the trial court failed to properly consider the sentencing factors and principles.

{¶ 61} We overrule this assignment of error.

{¶ 62} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

EILEEN T. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR