[Cite as *State v. L.A.B.*, 2021-Ohio-4323.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 20AP-120 |
| | | (C.P.C. No. 19CR-1904) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| [L.A.B.], | : | |
| Defendant-Appellant. | : | |

———

D E C I S I O N

Rendered on December 9, 2021

———

**On brief**: *G. Gary Tyack*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued**: *Kimberly M. Bond*.

**On brief**: *Timothy Young*, Ohio Public Defender, and *Timothy B. Hackett*, for appellant. **Argued**: *Timothy B. Hackett*.

———

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, L.A.B., from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following his entry of a guilty plea to two counts of aggravated robbery.

{¶ 2} On August 25, 2017, a complaint of delinquency was filed in the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch (hereafter "juvenile court"), alleging that appellant, then age 17, had committed the acts of kidnapping (2 counts), robbery (2 counts), aggravated menacing (1 count), and aggravated robbery (2 counts). The incident giving rise to the complaint was alleged to have occurred August 24, 2017.

{¶ 3}   On the date the complaint was filed, plaintiff-appellee, State of Ohio, also filed a motion requesting the juvenile court relinquish jurisdiction and transfer the case to the Franklin County Court of Common Pleas (hereafter "trial court") for prosecution of appellant as an adult.  The state sought bindover, pursuant to R.C. 2152.12(A) and (B), alleging there was probable cause to believe appellant committed the above acts and that he had a firearm on or about his person or under his control while committing the acts, and did display, brandish, or indicate possession of the firearm.  As part of an investigation associated with the incident, an inoperable Uzi-style BB gun was recovered on September 10, 2017.

{¶ 4}   On October 2, 2017, counsel for appellant filed a motion for a competency examination.  The juvenile court subsequently filed an entry ordering appellant to submit to an evaluation.  On March 5, 2018, appellant filed a motion to dismiss gun specifications. On March 14, 2018, the state filed a memorandum contra appellant's motion to dismiss.

{¶ 5}   Beginning September 6, 2018, the trial court conducted a hearing on the state's motion to relinquish jurisdiction, which included the testimony of Columbus Police Officer Paul Fetter.  On August 24, 2017, Officer Fetter and his partner received a report that an individual had attempted to open the door of a residence and was then observed walking away and heading westbound near Karl Road, Columbus. Upon arriving in the area, the officers noted suspicious activity outside a residence in which interior lights of two vehicles were illuminated.  Officer Fetter remained in the rear of the residence, while his partner went to the front.  Officer Fetter heard a female scream; the officer ran toward the front but then heard a crashing sound "at the rear of the house."  (Sept. 6, 2018 Tr. at 23.) Both officers ran toward the back, and Officer Fetter observed "a male black running through the yard."  The suspect "jumped the fence," running "west bound," and the officers were unsuccessful in pursuing him. (Sept. 6, 2018 Tr. at 24.)

{¶ 6}   Officer Fetter spoke with the victims, a husband and wife, who reported they had been watching television when an individual "came in the front door and had a gun." (Sept. 6, 2018 Tr. at 25.)  During the incident, the intruder pointed the gun "to the pregnant woman's stomach," and "put the male victim on his knees on the ground, held the gun to the back of his head."  (Sept. 6, 2018 Tr. at 27.)  The couple had a daughter asleep upstairs at the time.  The victims "were in shock," and the officers called the emergency squad "[f]or

the female victim who was pregnant."   The female "was very upset and needed assistance." (Sept. 6, 2018 Tr. at 28.)

{¶ 7}   Both of the alleged victims testified during the hearing.  In August 2017, S.R. and his wife, J.R., resided on Driftwood Road, Columbus.   On August 24, 2017, at approximately 9:00 p.m., S.R. and his wife were at home watching television when they heard a door creak.  S.R. got up and observed "a guy" enter their house wearing a ball cap "with a gun in his hand."  (Sept. 6, 2018 Tr. at 49.)  During the hearing, both S.R. and J.R. identified appellant as the individual who entered their home that evening.

{¶ 8}   S.R. testified the weapon had "a magazine at the bottom of it."  (Sept. 6, 2018 Tr. at 50.)  S.R.'s wife screamed, and the intruder "[t]old us to 'shut the fuck up.' "  (Sept. 6, 2018 Tr. at 51.)  The intruder asked for money and forced them "to empty our pockets * * *, and then he ended up taking our cell phones from us."  (Sept. 6, 2018 Tr. at 53.)  At one point, J.R., who was crying, told the intruder she was pregnant, and he went over to shut the door and he had the weapon "aimed * * * probably within 10 or 12 inches from her stomach."  (Sept. 6, 2018 Tr. at 54.)

{¶ 9}   He was also "threatening to shoot the dog if the dog did not stop barking." (Sept. 6, 2018 Tr. at 54.)  The intruder then indicated he wanted the "X-box," so J.R. got down to remove it and the "gun was pressed pretty good into the back of my head and never left the whole time I was down there."  (Sept. 6, 2018 Tr. at 55.)  The intruder started to count backwards from five, and when he got to two "the lights" from a police officer's flashlight shined "through the front window and he just vanished out the back door and put his body through our screened in porch and took off."  (Sept. 6, 2018 Tr. at 57.)

{¶ 10}  Following the incident, J.R. was "worked up so bad that the officer demanded that she get checked out and he called the squad and the squad came and took her to make sure everything was okay with her."  (Sept. 6, 2018 Tr. at 61.)  S.R. then spoke to the officers about the incident.  When describing the weapon, he noted a "bar" at the top of the gun and a "magazine."  (Sept. 6, 2018 Tr. at 63.)

{¶ 11}  S.R. was asked if he could identify a hearing exhibit (an inoperable BB gun) as the weapon he observed on the night of the incident.  He responded: "It could be possible."  (Sept. 6, 2018 Tr. at 73.)  He further stated that "the shape of that gun pretty much looks like the one that I saw."   (Sept. 6, 2018 Tr. at 77.)   The most distinguishing

feature of the weapon was the holding stock.  S.R stated that "to me * * * it was a very real gun."  (Sept. 6, 2018 Tr. at 80.)

{¶ 12}  J.R. testified that she had a high-risk pregnancy at the time of the events and received counseling following the incident.  She "was terrified" at the time, and stated she is "terrified every day now that something else is going to happen."  (Sept. 6, 2018 Tr. at 101-02.)

{¶ 13}  On cross-examination, J.R. described the weapon as "black" in color, with a "handle on the back of it."  (Sept. 6, 2018 Tr. at 106.)  Also during cross-examination, J.R. was shown an exhibit and the following exchange occurred between defense counsel and the witness:

Q.  [J.R.], does this look like the gun on the night in question?

A.  In my recollection it was a little bit larger than that.

Q.  The gun is black, correct?

A.  Yes.

Q.  And is this the lever that you saw?  If I pull it out does it look more like that?

A.  I do not believe so.  That is not how I remember it.

Q.  You said * * * it had a distinct sound - - it –

A.  No, it was definitely louder than that.

Q.  Tell me how this gun is either similar or different to what you saw that night, please?

A.  It's black and that's similar.  It's small at the front like the gun that I remember seeing.

Q.  And when you say "small in the front" are you talking up here where the barrel is?

A.  Yes.  Yes, sir.

Q.  So, the weapon on the night in question had a small barrel?

A.  Yes, sir.

Q. Just like this gun here?

A. I don't know if it was just like that gun. I know it was small like that gun, yes.

Q. And on the night in question, it - - it had a lever like this?

A. It did have a lever but it looked different than that, from my recollection.

(Sept. 6, 2018 Tr. at 107-08.)

{¶ 14} Columbus Police Detective Mark Paul responded to the report of a home invasion on August 24, 2017. Detective Paul and Detective James Bolt conducted a search of the area for a weapon, but no firearm was discovered. On cross-examination, Detective Paul testified that at some point during the investigation he received "a call saying that an Uzi style BB gun was located." (Sept. 6, 2018 Tr. at 124.)

{¶ 15} Appellant testified at the hearing. On direct examination, appellant stated he recognized an item introduced during the hearing as the weapon he had in August 2017. According to appellant, he informed police he had an Uzi-style BB gun at the time of his arrest.

{¶ 16} On cross-examination, appellant admitted to initially lying to police about his involvement. He later told police he took the weapon apart. Appellant testified that he wanted the victims "to think [the gun] was real but it wasn't real." (Sept. 7, 2018 Tr. at 29.) He acknowledged pointing the gun at S.R.'s head during the incident inside the residence.

{¶ 17} On October 1, 2018, the juvenile court filed a judgment entry finding probable cause to believe appellant committed the offenses of kidnapping, robbery, aggravated menacing, and aggravated robbery. The juvenile court did not find probable cause as to the gun specifications.

{¶ 18} The juvenile court subsequently held an amenability hearing spanning several dates (March 7, 13, and 14, April 1, 8, and 11, 2019). On April 11, 2019, the court announced from the bench a finding that appellant was not amenable to treatment in the juvenile system.

{¶ 19} On April 12, 2019, the juvenile court issued findings of facts and conclusions of law regarding the factors for discretionary bindover under R.C. 2152.12(D) and (E). On

April 17, 2019, the juvenile court filed a judgment entry granting the state's motion to relinquish jurisdiction and transfer the case for prosecution to the general division of the court of common pleas based on the juvenile court's determination appellant was not amenable to rehabilitation as a juvenile and that the safety of the community required that he be incarcerated beyond his majority.

{¶ 20} On April 24, 2019, the state filed an indictment with the trial court charging appellant with three counts of aggravated robbery, in violation of R.C. 2911.01, and two counts of kidnapping, in violation of R.C. 2905.01. Each of the five counts also carried a three-year firearm specification.

{¶ 21} On July 8, 2019, appellant filed a motion to dismiss the firearm specifications. On July 23, 2019, the state filed a memorandum contra. On September 19, 2019, the trial court conducted a hearing on the motion to dismiss the firearm specifications. On November 13, 2019, the trial court conducted a further hearing to allow the parties to present additional evidence regarding the trial court's concern there was an internal conflict in the juvenile court's entry of April 10, 2019. By decision and entry filed November 15, 2019, the trial court denied appellant's motion to dismiss the firearm specifications.

{¶ 22} On January 21, 2020, appellant entered a guilty plea to two counts of aggravated robbery without a firearm specification. The trial court entered a nolle prosequi as to the remaining three counts of the indictment. By judgment entry filed January 21, 2020, the trial court sentenced appellant to a term of seven years of incarceration as to each count, with the sentences to be served concurrently, for a total sentence of seven years.

{¶ 23} On appeal, appellant sets forth the following three assignments of error for this court's review:

> [I.] The Franklin County Prosecutor's Office abused its charging discretion and violated due process when it pursued mandatory bindover then criminal firearm specifications, even though its own investigation proved the item was a BB gun.
>
> [II.] After [appellant] was deemed amenable by one evaluator, the prosecutor's office failed to present sufficient credible evidence of non-amenability, in violation of R.C. 2152.12(B), the Fifth and Fourteenth Amendments to the U.S. Constitution, and Article I, Section 10 of the Ohio Constitution.

> [III.] A blended SYO sentence was a viable option. The juvenile court abused its discretion and erred as a matter of law when it decided otherwise.

{¶ 24} Under the first assignment of error, appellant contends the prosecutor's office violated due process and the rules of professional conduct when it pursued firearm specifications and initially sought mandatory bindover in the juvenile court despite its own conclusive forensic evidence that the alleged firearm was a BB gun. Appellant contends the prosecutor's office violated the Ohio Rules of Professional Conduct, relying specifically on the provisions of Prof.Cond.R. 3.8(a).[1]

{¶ 25} Appellant further argues that prosecutors, in bringing an indictment in the trial court that included three-year firearm specifications, ignored the juvenile court's no probable cause finding. According to appellant, as a result of the prosecutor's actions, both the indictment and resulting plea were invalid and the conviction must be vacated.

{¶ 26} As noted by the state, appellant's argument under the first assignment of error does not challenge the bindover proceedings but, rather, the indictment itself. Specifically, appellant contends that indicting him "on charges for which a juvenile court found no probable cause constituted official misconduct, or, in the very least, an abuse of charging discretion," and that the indictment in this case is "invalid." (Appellant's Brief at 28.)

{¶ 27} As also noted by the state, appellant raised the argument that firearm specifications should not have been presented to the grand jury in his pre-trial motion to dismiss the firearm specifications. As set forth under the facts, the trial court conducted a hearing on that motion on September 19, 2019. During the hearing, defense counsel cited the juvenile court's finding during the probable cause hearing that the weapon used in the incident was a BB gun, and that the operability report "said that it was not a firearm as defined under Ohio law because it was a broken BB gun." (Sept. 19, 2019 Tr. at 6.) Defense counsel argued that collateral estoppel precluded the state from charging appellant with firearm specifications.

---

[1] Prof.Cond.R. 3.8(a) states in part that a prosecutor in a criminal case shall not "pursue or prosecute a charge that the prosecutor *knows* is not supported by probable cause." (Emphasis sic.)

{¶ 28} In response, the state argued that the "stipulated firearm operability report stipulated to the veracity of the report itself," and that "there was no evidence as to where this firearm was located." (Sept. 19, 2019 Tr. at 15-16.) The state further argued that "this black BB gun that was recovered has no bearing on the case before the Court now, and that there's nothing linking this BB gun to the crime outside of the Defendant's own statements." The prosecutor noted "[t]he testimony heard at the probable cause and amenability hearings was that the female victim said this was not the firearm. The firearm presented for this report was not the firearm that was pointed at her that day." The prosecutor argued "the theory of the State is that the firearm used in the incident was never recovered." (Sept. 19, 2019 Tr. at 17.) According to the prosecutor, the state's position was that appellant "entered into this home, presented as if he had a firearm, and then fled and ditched that firearm somewhere, and it was never recovered" and that "[u]nrelated to, a BB gun was found in a window well * * * in the same development * * * two, three weeks later." (Sept. 19, 2019 Tr. at 19.)

{¶ 29} On November 15, 2019, the trial court filed a decision and entry denying appellant's motion to dismiss the firearm specifications. In addressing the motion, the trial court determined it must "manage the inherent inconsistency and decisional tension created by the juvenile court's October 2018 and April 2019 Judgment Entries," noting that "although the juvenile court stated that it did not find probable cause for a gun specification on counts 1 through 7 at page 8 of its April 2019 findings, it also noted at page 9 that 'The Court finds that [defendant] did indicate that he possessed a firearm.' " (Nov. 15, 2019 Decision at 4.)

{¶ 30} Citing the provisions of R.C. 2941.145(A), the trial court held in part: "The statutory language is clear that a firearm specification is appropriate if an offender *indicates* that he possessed a firearm. In the present case, the April 2019 Judgment Entry, to which the defendant asked this Court to defer in the September 2019 evidentiary hearing, states the juvenile court found that the defendant 'did indicate' he possessed a firearm." (Emphasis sic.) The trial court therefore found "an indictment by the grand jury for a firearm specification is wholly consistent with the findings made by the juvenile court on more than one occasion in its April Judgment Entry." (Nov. 15, 2019 Decision at 5.)

{¶ 31} In denying the motion to dismiss the firearm specifications, the trial court also relied on the second paragraph of the syllabus of the Supreme Court of Ohio's decision in *State v. Adams*, 69 Ohio St.2d 120 (1982).² Based on the holding in *Adams*, the trial court determined that "[e]ven *if* the juvenile court's findings had not included a conclusion that the defendant indicated he possessed a firearm, which is one of the statutory bases for firearm specifications, relevant case and statutory law support the plaintiff's ability to present evidence to the grand jury consistent with the facts of the case and to allow the grand jury to make a determination regarding what charges should be indicted based on that evidence." (Emphasis sic.) (Nov. 15, 2019 Decision at 7.)

{¶ 32} As indicated, appellant contends the prosecutor engaged in professional misconduct by including firearm specifications in the indictment following the juvenile court's decision on discretionary bindover. We note appellant's motion to dismiss the firearm specifications before the trial court did not assert a violation of the Rules of Professional Conduct by the state in bringing those specifications as part of the indictment. Further, appellant cites no authority in support of reversal of a criminal conviction based on a claimed violation under Prof.Cond.R. 3.8(a).

{¶ 33} Ohio appellate courts, however, have rejected similar arguments. *See, e.g.*, *State v. Frazier*, 8th Dist. No. 62557 (Feb. 17, 1994) (in order to challenge prosecutor's purported violation of Disciplinary Rule under Code of Professional Responsibility, "appellant is entitled to file a complaint * * * with the Board of Commissioners on Grievances and Discipline of the Supreme Court," but he "may not rely upon a rule meant as a guide for attorneys to follow to maintain the professionalism of the practice of law to support his assertion of error in the trial proceedings"); *State v. Montgomery*, 8th Dist. No. 99452, 2013-Ohio-4193, ¶ 36 ("[w]e have no authority to address claimed violations of the Rules of Professional Conduct – that authority rests solely with the Ohio Supreme Court"); *State v. Brock*, 2d Dist. No. 2018-CA-112, 2019-Ohio-3195, ¶ 35 ("When an attorney's alleged violation of the rules of professional conduct is asserted as a basis for appeal, we lack jurisdiction to address that issue."). Here, to the extent appellant seeks reversal of his

---

² In *Adams* at paragraph two of the syllabus, the Supreme Court held: "When a minor is transferred from the Juvenile Court to the Court of Common Pleas on a charge which would constitute a felony if committed by an adult, the grand jury is empowered to return any indictment under the facts submitted to it and is not confined to returning indictments only on charges originally filed in the Juvenile Court."

conviction on appeal based on a purported violation of the Rules of Professional Conduct, we find such claim to be without merit.

{¶ 34} As indicated, appellant also presents a challenge to the indictment itself. In general, however, "a guilty plea waives the right to claim error arising from a defective indictment." *State v. Boyle*, 2d Dist. No. 2018-CA-12, 2018-Ohio-3284, ¶ 8, citing *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324. This principle similarly applies to due process claims based on alleged "overcharging." *State v. Buhrman*, 2d Dist. No. 16789 (June 26, 1998) (appellant, by entering guilty plea, waived his challenge that the trial court violated his right to due process "by allowing the state to 'overcharge' in its indictment"); *State v. Black*, 8th Dist. No. 102586, 2017-Ohio-953, ¶ 9 ("A guilty plea * * * waives the right to a direct appeal of any alleged defects in the indictment, such as 'overcharging.' "). In the present case, appellant entered a guilty plea to two counts of aggravated robbery, and we agree with the state's contention that he has waived the right to appeal any alleged defects in the indictment, "including that the charges in the indictment were excessive." *State v. Green*, 2d Dist. No. 2020-CA-6, 2021-Ohio-15, ¶ 37.

{¶ 35} We further note that all of the firearm specifications were dismissed in this case as a result of the plea agreement, and we therefore also agree with the state's argument that appellant cannot demonstrate prejudice. *See State v. Frazier,* 8th Dist. No. 106772, 2019-Ohio-1433, ¶ 30 (where "six of the seven counts to which appellant takes issue were nolled by the prosecutor as part of a plea agreement," reviewing court could not "fathom how appellant could therefore establish that he was in any way prejudiced because he was not convicted of Counts 8 through 13" of indictment); *State v. Sherouse*, 2d Dist. No. 10046 (Mar. 18, 1987) (even if shotgun was not a firearm, "we fail to see how the State's inability to prove the dismissed [firearm] specification prejudiced the defendant" as "[h]is no contest plea was an admission of the truth of the facts alleged in the indictment without the specification"); *Preston v. Schweitzer*, S.D.Ohio No. 3:15-cv-459 (Nov. 8, 2016) (rejecting constitutional claim that firearm specifications dismissed in juvenile court precluded indictment on firearm specifications in adult court and noting that "[i]n any event, [the defendant] never pleaded guilty to or was sentenced on the firearm specifications").

{¶ 36} Based on the foregoing, appellant's first assignment of error is not well-taken and is overruled.

{¶ 37} Under his second assignment of error, appellant presents three separate challenges to the amenability determination by the juvenile court. Specifically, appellant raises issues with respect to: (1) who bears the burden of proof on the issue of non-amenability, (2) what is the proper standard of proof for non-amenability, and (3) whether the juvenile court's non-amenability finding was supported by sufficient, credible evidence.

{¶ 38} In the present case, the juvenile court conducted an amenability hearing in a discretionary bindover proceeding and determined appellant was not amenable to care or rehabilitation within the juvenile system. In general, the provisions of R.C. 2152.12(B) govern "discretionary bindover of delinquency cases from juvenile court to the court of common pleas." *State v. Marshall*, 1st Dist. No. C-150383, 2016-Ohio-3184, ¶ 12. After the filing of a complaint charging a child with an offense that would be a felony if committed by an adult, the juvenile court may transfer jurisdiction of the case to the court of common pleas if it finds at a hearing that "(1) the child was 14 years of age or older at the time of the act in the complaint, (2) probable cause exists that the child committed the act in the complaint, and (3) the child is not amenable to care or rehabilitation within the juvenile system and should be subject to adult sanctions to ensure the safety of the community." *Id.,* citing R.C. 2152.12(B)(1) through (3).

{¶ 39} If the juvenile court "finds that the age and probable-cause elements have been satisfied, the juvenile court must conduct a 'full investigation' before making an amenability determination." *Id.* at ¶ 13, citing Juv.R. 30(C) and R.C. 2152.12(C). The investigation "includes an inquiry into the child's social history, education, and familial situation, as well as a mental examination of the child by a qualified agency or individual." *Id.*

{¶ 40} In determining whether a child is amenable to treatment within the juvenile system, "the juvenile court must consider the factors weighing in favor of and against transfer, as outlined in R.C. 2152.12(D) and 2152.12(E), as well as any other relevant factor." *Id.* at ¶ 14, citing R.C. 2152.12(B)(3) and *State v. Amos*, 1st Dist. No. C-150265, 2016-Ohio-1319, ¶ 22. The record before the juvenile court "must 'indicate the specific factors that were applicable and that the court weighed.' " *Id.*, quoting R.C. 2152.12(B)(3). Further, "the juvenile court must state the reasons for transfer on the record and in the order of transfer." *Id.*, citing R.C. 2152.12(I) and Juv.R. 30(G).

{¶ 41} A juvenile court's amenability determination pursuant to R.C. 2152.12 "will not be reversed unless the juvenile court has abused its discretion." *Id.* at ¶ 15, citing *State v. Washington*, 1st Dist. No. C-130213, 2014-Ohio-4178, ¶ 19, citing *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, ¶ 39. Because R.C. 2152.12 is "silent with regard to how a juvenile court should weigh the factors in R.C. 2152.12(D) and (E) * * * the juvenile court has the discretion to determine how much weight should be accorded to any given factor." *Id.*, citing *State v. Morgan*, 10th Dist. No. 13AP-620, 2014-Ohio-5661, ¶ 37. Furthermore, " '[a]s long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors, [this court] cannot conclude that the trial court abused its discretion in deciding whether to transfer jurisdiction.' " *Id.*, quoting *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, ¶ 10 (4th Dist.).

{¶ 42} Appellant initially argues that Ohio's amenability statute is silent as to who must prove non-amenability and by what level of proof. Appellant acknowledges these issues were not raised before the juvenile court, but contends this court "should resolve" these questions on appeal. (Appellant's Brief at 30.) More specifically, appellant argues this court should conclude the prosecution bears the burden of proof by clear and convincing evidence.

{¶ 43} In response, the state notes (as acknowledged by appellant) that these issues were not raised before the juvenile court. The state further notes the Supreme Court has recently accepted jurisdiction in a case from the Second District Court of Appeals to address the appellant's propositions of law in that case which include determinations as to: (1) the standard of review in amenability hearings as well as (2) the prosecutor's burden. *See State v. Nicholas*, 2d Dist. No. 2018-CA-25, 2020-Ohio-3478, *discretionary appeal allowed by State v. Nicholas*, 161 Ohio St.3d 1439, 2021-Ohio-375. The state maintains, however, current precedent from the Supreme Court provides that the applicable standard of review governing a juvenile court's amenability decision is whether the court abused its discretion in rendering that decision.

{¶ 44} The record reflects appellant did not raise either of these issues before the juvenile court, i.e., whether the state bore the burden of proof, and whether such proof was by clear and convincing evidence. Under Ohio law, "it is well settled that '[a] party who fails

to raise an argument in the court below waives his or her right to raise it here.' " *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 34, citing *State ex rel. Zollner v. Indus. Comm.,* 66 Ohio St.3d 276, 278 (1993). *See also State v. Casalicchio*, 8th Dist. No. 55655 (Aug. 31, 1989) (the appellant's failure to object at hearing to the burden of proof constitutes "a waiver of any claim of error").

{¶ 45} We further agree with the state that, based on Supreme Court precedent as well as precedent from this court, a juvenile court's amenability determination is reviewed under an abuse of discretion standard. *See In re M.P.,* 124 Ohio St.3d 445, 2010-Ohio-599, ¶ 14 ("a juvenile court's determination regarding a child's amenability to rehabilitation in the juvenile system is reviewed by an appellate court under an abuse-of-discretion standard"); *State v. Reeder,* 10th Dist. No. 15AP-203, 2016-Ohio-212, ¶ 17 ("[w]e review for abuse of discretion the merits of the decision by the juvenile court to relinquish jurisdiction in favor of the general division"); *State v. Easley,* 10th Dist. No. 16AP-9, 2016-Ohio-7271, ¶ 6 (noting "[t]he Supreme Court of Ohio has consistently applied the abuse-of-discretion standard in the review of discretionary-transfer proceedings from juvenile court to the general division of common pleas court"). Further, the Supreme Court has recognized that a juvenile court "enjoys wide latitude to retain or relinquish jurisdiction." *State v. Watson*, 47 Ohio St.3d 93, 95 (1989).

{¶ 46} Finally, we note appellant cites no Ohio case law in which a reviewing court has delineated a clear and convincing standard with respect to an amenability determination. As we are bound by precedent of the Supreme Court, we will review the juvenile court's amenability determination in this case under the abuse of discretion standard.

{¶ 47} We therefore turn to appellant's contention the juvenile court erred in finding he was not amenable to treatment in the juvenile system. As noted above, appellant was bound over to the adult court pursuant to a discretionary transfer governed by R.C. 2152.12(B). In this respect, Ohio's juvenile justice system provides for both "mandatory and discretionary" transfer. *State v. Crosby*, 8th Dist. No. 107392, 2019-Ohio-2217, ¶ 24, citing *State v. Mays*, 8th Dist. No. 100265, 2014-Ohio-3815, ¶ 17, citing *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544. In contrast to mandatory transfer, which " ' "removes discretion from judges in the transfer decision in certain situations," ' " discretionary

transfer " ' "allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety." ' " *Id.*, quoting *Mays* at ¶ 17, quoting *D.W.*; R.C. 2152.12(A) and (B).

{¶ 48} R.C. 2152.12(B) states as follows:

> Except as provided in division (A) of this section, after a complaint has been filed alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following:
>
> (1) The child was fourteen years of age or older at the time of the act charged.
>
> (2) There is probable cause to believe that the child committed the act charged.
>
> (3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred. The record shall indicate the specific factors that were applicable and that the court weighed.

{¶ 49} Accordingly, in making its amenability determination, "the juvenile court must consider whether the applicable factors under R.C. 2152.12(D), indicating that the case should be transferred, outweigh the applicable factors under R.C. 2152.12(E), indicating that the case should not be transferred." *Crosby* at ¶ 27, citing R.C. 2152.12(B)(3); *State v. Jones*, 8th Dist. No. 99044, 2013-Ohio-3725, ¶ 8. Further, "aside from the specifically enumerated factors, the juvenile court is instructed to consider 'any other relevant factors.' " *Id.*, citing R.C. 2152.12(D) and (E).

{¶ 50} R.C. 2152.12(D), which sets forth the relevant factors in favor of transfer, states as follows:

> In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following

relevant factors, and any other relevant factors, in favor of a transfer under that division:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 51} R.C. 2152.12(E), which sets forth relevant factors against transfer, states as follows:

In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, against a transfer under that division:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 52} In the present case, it was undisputed appellant was over the age of 14 at the time of the alleged activity, and the juvenile court found probable cause that he committed the acts of kidnapping, aggravated robbery, robbery, and aggravated menacing. The juvenile court also conducted an amenability hearing.

{¶ 53} During the amenability hearing, the juvenile court heard testimony from a number of witnesses,[3] including Shelley Hughes, a juvenile probation officer, Dr. Daniel Davis, a forensic psychologist, and Curtis Richardson, a juvenile court guardian ad litem. Hughes testified that appellant was placed at Buckeye Ranch in Grove City in February 2017, and he was removed in April 2017 "for on-going behaviors; he was intimidating staff,"

---

[3] The witnesses at the amenability hearing included the alleged victims (S.R. and J.R.), Christina Heller, and Jocelyn Cannon, both caseworkers with Franklin County Children Services, Dr. Daniel Davis, a forensic psychologist, D.B., appellant's maternal grandmother, Curtis Richardson, a juvenile court guardian ad litem, Miguel Tucker, director of the Juvenile Justice Coalition, Mercedes Anderson, a crisis counselor, and appellant.

and there were "a lot of issues with female staff." According to Hughes, appellant was "verbally aggressive towards staff, especially the female staff members." (Mar. 7, 2019 Tr. at 58.) Hughes testified "we've exhausted everything and Probation doesn't have anything else to offer him." (Mar. 7, 2019 Tr. at 60.)

{¶ 54} Dr. Davis, who conducted a psychological evaluation of appellant, testified that appellant has "done well in some placements; he's done very poorly in others." He noted appellant's behavior at Buckeye Ranch "was characterized by aggression," including possession of a razorblade as contraband. (Mar. 7, 2019 Tr. at 76.) In his last group home, appellant "was reported to have gone AWOL and was described as not progressing in his treatment." In another placement at a group home, "he committed an auto theft offense" involving "a hit/skip." (Mar. 7, 2019 Tr. at 78.)

{¶ 55} Dr. Davis performed a personality assessment (MMPI-A-RF) of appellant. Overall, appellant's testing "protocol identified very significant, psychological and behavioral problems" as well as "significant thought dysfunction." (Mar. 7, 2019 Tr. at 80-81.) Dr. Davis stated appellant "may be at risk for non-compliance as well as acting out," and he described appellant as being seriously mentally ill. (Mar. 7, 2019 Tr. at 82.)

{¶ 56} Dr. Davis concluded appellant "remained * * * a moderate to high risk of future aggressive behavior." According to Dr. Davis, "what we see is that his mental illness and psychopathology is not only severe but it has been obviously difficult to treat." (Mar. 7, 2019 Tr. at 86.) He described this as "a very difficult case" with "no easy answers." (Mar. 7, 2019 Tr. at 87.) In looking at the fact appellant was 19 years of age, with "two years left in the juvenile system," Dr. Davis came to the opinion that it would be "very difficult for him to receive adequate treatment through the supervision of juvenile court based on the fact that he has not yet responded in very excellent programs, and now he is 19 years old and still hasn't responded. So, I was very concerned that two years of treatment would not be an adequate length of time." (Mar. 7, 2019 Tr. at 87.) Dr. Davis opined that, while appellant "is seriously mentally ill," he "is neither intellectually disabled nor does he have a developmental disability." The principal concerns noted by Dr. Davis involved "the seriousness of [appellant's] problems and the length of treatment available in the juvenile justice system." (Mar. 7, 2019 Tr. at 94.) With respect to the issue of amenability to

treatment, Dr. Davis opined that appellant "falls in the * * * low to moderate end of amenability for all of the reasons that I have outlined." (Mar. 7, 2019 Tr. at 97.)

{¶ 57} In response to an inquiry whether appellant could be rehabilitated in the juvenile system, Dr. Davis stated: "I think he has a low probability - - low to moderate probability and I also voice the concern that his needs may exhaust the capacities of the juvenile justice system.  He has been in treatment for a very long time, he has not responded, at least in terms of his delinquent behavior." Dr. Davis further stated: "The time now is very limited and if we look at the lack of responsiveness and the length of time that he has been in the system and the length of time that remains, it is my opinion that the juvenile justice system's capacities may be exhausted." (Mar. 13, 2019 Tr. at 37.)  Dr. Davis opined he would be concerned for the safety of individuals in appellant's vicinity, should he be released in the community, "on the basis of his lack of response to date having experienced very good treatment." (Mar. 13, 2019 Tr. at 55.)

{¶ 58} Curtis Richardson, appellant's prior guardian ad litem, testified he believed the Department of Youth Services ("DYS") would be better for appellant than the Ohio Department of Correction based on concerns appellant would not be able "to adapt to an environment" where he has "not completed some of the things that would help him to be successful * * *, including education and some of the socialization programs." (Mar. 13, 2019 Tr. at 149.)  He believed DYS would be a better environment "in terms of his safety" and "his opportunity to develop." (Mar. 13, 2019 Tr. at 154.)

{¶ 59} On April 11, 2019, following the close of the hearing testimony, the juvenile court made findings on the record, including the court's finding that appellant "is not amenable to treatment in the juvenile justice system." (Apr. 11, 2019 Tr. at 10.)  The juvenile court therefore granted the state's motion to relinquish jurisdiction.

{¶ 60} On April 17, 2019, the trial court issued a written decision on its amenability determination.  In that decision, the juvenile court discussed each of the factors under R.C. 2152.12(D) and (E).

{¶ 61} In considering the factors under R.C. 2152.12(D), the trial court found in part:

> * * * (D)(1), the victims under these charges of the acts did in
> fact suffer physical, emotional, psychological and economic
> harm.  The Court finds that one of the victims in the case
> suffered physical harm.  [J.R.] was transported to the hospital

because of the trauma. She was pregnant at the time of the alleged offenses. She is still visibly shaken and continues to go through counseling for post-traumatic stress disorder. [S.R.] suffered psychological harm and the family also suffered economic harm as they moved from the residence where the alleged offenses occurred to provide a safe environment for their family and they incurred financial expenses in moving to another residence.

Subsection (D)(2)[:] The Court finds that [J.R.'s] pregnancy exasperated the physical and psychological harm to the victim.

Subsection (D)(3)[:] The Court finds that [appellant] had no relationship with the victims that facilitated the acts charged. Therefore, this factor is not applicable.

Subsection (D)(4)[:] The Court finds there is no indication that [appellant] is a member of a strategic threat group or had any instructions to perform the alleged acts for hire[]. Therefore, this factor is not applicable.

Subsection (D)(5)[:] The Court did not find probable cause that a weapon was used however, the weapon admitted into evidence was a BB gun or pellet gun that would have been hard for the alleged victims to distinguish from a real weapon. The Court finds that [appellant] did not use, display or brandish a firearm but he did indicate that he possessed a firearm.

Subsection (D)(6)[:] [Appellant] was on probation in case number 16JU-10990 for Burglary, (F-2).

Subsection (D)(7)[:] On February 10, 2017, [appellant] was placed in Pomegranate when he was placed on probation. While in Pomegranate he had numerous violations of policies for aggression, contraband in his room, lighters, a razor blade, smoking on the unit, and testing positive for chemicals found in cough syrup. A motion for probation violation was filed on April 14, 2017, for violating rules. He was physically aggressive towards staff at the Buckeye Ranch. He was discharged in July of 2017 and went to New Life Group Home. He was having some problems with getting his medication. Once he reported this to probation the problem was quickly rectified however, probation was notified on August 24, 2018, that he went AWOL from the group home. He was arrested on the charges related to this case.

Subsection (D)(8)[:] [Appellant] is emotionally mature enough for the transfer. He has had the benefit of mentoring, the love and support of his grandmother, he has the ability to understand the charges and assist his attorney in his defense. He has had the benefit of inpatient counseling on two occasions. He scores a moderate risk of recidivism. He has become adept at working the system. He has been AWOL from a group home on a prior occasion when he stole a car, picked his girlfriend up and went to a hotel where they stayed the night. He has an understanding of his criminal behavior but due to his lack of parenting at a young age he uses whatever means necessary to meet his needs. He witnessed and experienced domestic violence routinely throughout his young life, which has affected him but does not rise to a level that the Court finds that he does not have an emotional, physical or psychological maturity.

There is not sufficient time to rehabilitate the child within the juvenile system. This factor gave the Court the most pause because [appellant] is currently nineteen years of age. The juvenile system would have two years or a little less to rehabilitate him. [Appellant] has escalated in his alleged criminal behavior. He has several cases that were adjudicated in 2016 that arose in a brief period of time. He was on alternative to commitment probation at the time of these offenses. He has had two inpatient placements at Pomegranate and has also been placed at Buckeye Ranch. He has been on his medication and still did not comply with the rules of placement. He was AWOL from a group home when he was arrested in 2016 and 2017. The Court considered the average age of youth in the Department of Youth Services and that is currently seventeen and a half years of age. [Appellant] is much older than the youth currently in the Department of Youth Services. He has had the benefit of inpatient treatment that has not deterred his behavior. The Court finds that the juvenile system does not have sufficient time to rehabilitate him.

(Apr. 17, 2019 Decision at 9-11.)

{¶ 62} In considering the factors weighing against transfer, the trial court held in part:

[R.C. 2152.12(E)(1):] This factor is not applicable.

[R.C. 2152.12(E)(2):] This factor is not applicable.

[R.C. 2152.12(E)(3):] [Appellant] is the principal actor and only individual in the act charged.

[R.C. 2152.12(E)(4):] The Court has more than reasonable cause to believe that physical harm occurred to [J.R.]. She told [appellant] that she was pregnant and she testified that he pointed the weapon at her stomach. Although the Court found that the weapon was not real, [appellant] threatened her to make her believe that harm would occur. She had to be transported to the hospital with the threat of a miscarriage. [S.R.] testified that the weapon was pointed at his head. He had no knowledge at the time that he would not be injured. [Appellant] had reason to believe that harm would have occurred would he threatened the alleged victims and their small child. [sic.]

[R.C. 2152.12(E)(5):] [Appellant] has previously been adjudicated a delinquent child for committing burglary.

[R.C. 2152.12(E)(6):] The Court finds that he is emotionally, physically and psychologically mature enough for transfer.

[R.C. 2152.12(E)(7):] [Appellant] has a mental illness diagnosis based upon the psychological reports prepared for this hearing however, the record is clear that he was on his medication at the group home when the alleged incident occurred.

[R.C. 2152.12(E)(8):] Dr. Davis concluded that there are more factors that [appellant] is not amenable to treatment in the juvenile justice system. Dr. Speicher-Bojica opined that a serious youthful offender specification should be applied however, this specification is not part of the complaint and a specification can only be added at the time of an adjudication not at a probable cause hearing. The Court finds that none of the mental health disorders in [appellant's] diagnosis rise to a level of incompetence to understand the actions that he has committed to assist with his own defense or understand the nature of these proceedings.

(Apr. 17, 2019 Decision at 11-12.)

{¶ 63} A review of the record indicates the juvenile court complied with the requirements for discretionary transfer by addressing, as set forth above, all the statutory factors. Here, the juvenile court found "[a]ll the factors in favor of transfer apply except Factor three as [appellant] did not have a relationship with the victim that facilitated the

act."  The juvenile court also found appellant "is emotionally, physically and psychologically mature enough for transfer."  (Apr. 17, 2019, Decision at 3.)

{¶ 64}  In looking at the factors "against transfer," the juvenile court found "none of them apply."   The juvenile court noted the victim "did not facilitate or induce this," appellant "did not act under provocation," appellant "was the sole actor in this," he "did cause physical and psychological harm" as well as physical harm to property, and he "caused extreme psychological distress to both [J.R.] and [S.R.]"  (Apr. 17, 2019 Decision at 4.)

{¶ 65}  The juvenile court further noted Dr. Davis "was very strong about [appellant] having a very serious mental illness and there is not sufficient time to rehabilitate him."  In addressing whether there was sufficient time for rehabilitation, the juvenile court noted there was "less than two years," and cited testimony by Dr. Davis that appellant "does better when he is in a structured setting but when he is released he is dangerous."  The juvenile court also cited evidence that appellant's "delinquent behavior has escalated," starting with "minor offenses" and moving on to "a burglary," and then committing the home invasion at issue "all while this Court was trying to provide state of the art treatment."  The court found appellant "has had the best treatment yet his behavior has worsened."  (Apr. 17, 2019 Decision at 4.)

{¶ 66}  The record indicates the juvenile court complied with all the statutory requirements for discretionary transfer, and the court's finding that the factors in favor of transfer outweighed the factors against transfer is amply supported by the record.  Based on this court's review, we find no abuse of discretion by the juvenile court in concluding that appellant was not amenable to care or rehabilitation within the juvenile system and that the safety of the community required that he be subject to adult sanctions.

{¶ 67}  Based on the foregoing, appellant's second assignment of error is not well-taken and is overruled.

{¶ 68}  Under the third assignment of error, appellant asserts the juvenile court should have considered a blended or serious youthful offender ("SYO") sentence. According to appellant, a SYO sentence falls under the "any other relevant factors" against a transfer provision under R.C. 2152.12(E).

{¶ 69} In response, the state argues appellant did not raise the issue of a SYO sentence in the juvenile proceedings and, therefore, did not preserve that issue for appeal. The state further argues that, even if it had been raised, the issue is moot because the juvenile court relinquished jurisdiction. Finally, the state argues a juvenile court may only impose a SYO sentence when the state initiates the process through a charging instrument or by filing notice, in accordance with R.C. 2152.13(A)(4).

{¶ 70} In general, as characterized by the Supreme Court, "[a] serious-youthful-offender disposition consists of a 'blended' sentence: a traditional juvenile disposition and a stayed adult sentence." *State v. D.H.,* 120 Ohio St.3d 540, 2009-Ohio-9, ¶ 2, citing R.C. 2152.13(D)(2). With respect to this type of disposition "[t]he court may enforce the adult portion of the sentence at a later time if the juvenile commits certain acts that indicate that the juvenile disposition has been unsuccessful in rehabilitating him." *Id.,* citing R.C. 2152.14. Under the statutory scheme "[a] juvenile charged as a potential serious youthful offender does not face bindover to an adult court." *D.H.* at ¶ 18. Rather, "the case remains in the juvenile court." *Id.*

{¶ 71} R.C. 2152.02(W) defines the term "[s]erious youth offender," and states as follows:

> "Serious youthful offender" means a person who is eligible for a mandatory SYO or discretionary SYO but who is not transferred to adult court under a mandatory or discretionary transfer and also includes, for purposes of imposition of a mandatory serious youthful dispositional sentence under section 2152.13 of the Revised Code, a person upon whom a juvenile court is required to impose such a sentence under division (B)(3) of section 2152.121 of the Revised Code.

{¶ 72} R.C. 2152.13 governs SYO dispositional sentencing, and R.C. 2152.13(A) states as follows:

> A juvenile court shall impose a serious youthful dispositional sentence on a child when required under division (B)(3) of section 2152.121 of the Revised Code. In such a case, the remaining provisions of this division and divisions (B) and (C) do not apply to the child, and the court shall impose the mandatory serious youthful dispositional sentence under division (D)(1) of this section.

In all other cases, a juvenile court may impose a serious youthful offender dispositional sentence on a child only if the prosecuting attorney of the county in which the delinquent act allegedly occurred initiates the process against the child in accordance with this division, and the child is an alleged delinquent child who is eligible for the dispositional sentence. The prosecuting attorney may initiate the process in any of the following ways:

(1) Obtaining an indictment of the child as a serious youthful offender;

(2) The child waives the right to indictment, charging the child in a bill of information as a serious youthful offender;

(3) Until an indictment or information is obtained, requesting a serious youthful offender dispositional sentence in the original complaint alleging that the child is a delinquent child;

(4) Until an indictment or information is obtained, if the original complaint does not request a serious youthful offender dispositional sentence, filing with the juvenile court a written notice of intent to seek a serious youthful offender dispositional sentence within twenty days after the later of the following, unless the time is extended by the juvenile court for good cause shown:

(a) The date of the child's first juvenile court hearing regarding the complaint;

(b) The date the juvenile court determines not to transfer the case under section 2152.12 of the Revised Code.

After a written notice is filed under division (A)(4) of this section, the juvenile court shall serve a copy of the notice on the child and advise the child of the prosecuting attorney's intent to seek a serious youthful offender dispositional sentence in the case.

{¶ 73} As indicated by the state in its appellate brief, in *Nicholas*, the Second District Court of Appeals recently addressed an argument similar to the one raised by appellant in the instant appeal.[4] Under the facts of *Nicholas,* the defendant was charged with

---

[4] As also observed by the state, in accepting review of the Second District Court of Appeal's decision in *Nicholas*, one of the propositions of law to be decided by the Supreme Court is the issue of a juvenile court's consideration of a SYO sentence.

delinquency and the state sought a transfer to adult court. Following an amenability hearing, the juvenile court granted transfer under the discretionary transfer provisions of R.C. 2152.10(B). In challenging the court's amenability determination, the defendant asserted the juvenile court "misperceived the scope of its authority and the flexibility inherent in the juvenile system by failing to consider other options, like a serious youth offender * * * designation," arguing that "a traditional minimum commitment was not appropriate and that a blended sentence would have been the most obvious solution." *Id.* at ¶ 74.

{¶ 74} The reviewing court in *Nicholas* rejected this argument, holding in part:

R.C. 2152.02(W) defines a serious youthful offender as "a person who is eligible for a mandatory SYO or discretionary SYO but who is not transferred to adult court under a mandatory or discretionary transfer and also includes, for purposes of imposition of a mandatory serious youthful dispositional sentence under section 2152.13 of the Revised Code, a person upon whom a juvenile court is required to impose such a sentence under division (B)(3) of section 2152.121 of the Revised Code."

As a preliminary matter, Nicholas does not fit within this definition, as his case was, in fact, transferred to adult court. Under R.C. 2152.10(B), if the court chooses not to transfer a child to adult court and adjudicates the child delinquent, the court is required to issue a dispositional order in accordance with R.C. 2152.11. If the case had not been transferred, Nicholas would have been eligible for mandatory SYO under R.C. 2152.11(B)(1); he would not have been eligible for "[t]raditional juvenile" disposition. R.C. 2152.11(B)(3). In this situation, the court would have imposed the available adult court sentence, as well as a traditional juvenile disposition, but would have stayed the adult sentence pending successful completion of the juvenile disposition. *See* R.C. 2152.13(D)(1)(a)-(c).

The fact that Nicholas would have been eligible for SYO disposition does not mean that the court was required to take this into consideration before deciding amenability. To the contrary, this disposition is not available unless the court has elected not to transfer the child. The juvenile court would have been aware of this fact. And finally, as the State notes in its brief, in situations like the present, "a juvenile court may impose a serious youthful offender dispositional sentence on a

> child only if the prosecuting attorney of the county in which the delinquent act allegedly occurred initiates the process against the child in accordance with" R.C. 2152.13. *See* R.C. 2152.13(A).

*Id.* at ¶ 75-77.

{¶ 75} As noted, R.C. 2152.02(W) defines a serious youth offender as "a person who is eligible for a mandatory SYO or discretionary SYO but who is not transferred to adult court under a mandatory or discretionary transfer." Similar to the facts and reasoning of the court in *Nicholas,* we conclude appellant does "not fit within this definition" where the juvenile court transferred the case to the adult court. We further agree with the *Nicholas* court's interpretation of R.C. 2152.13(A), i.e., "in situations like the present, 'a juvenile court may impose a serious youthful offender dispositional sentence on a child only if the prosecuting attorney of the county in which the delinquent act allegedly occurred initiates the process against the child in accordance with' R.C. 2152.13." *Nicholas* at ¶ 77, quoting R.C. 2152.13(A). Under the fact of this case, as in *Nicholas,* the prosecuting attorney did not employ one of the several methods for seeking a SYO disposition. Here, as the juvenile court determined appellant was not amenable to care or rehabilitation within the juvenile system and granted the request for transfer to adult court, and where the state did not initiate the process for a SYO disposition, appellant has failed to show the juvenile court erred in failing to consider a blended sentence as part of its amenability determination.

{¶ 76} Appellant's third assignment of error is not well-taken and is overruled.

{¶ 77} Based on the foregoing, appellant's three assignments are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

_____